The way I'd like to proceed is to give the appellate's argument to comment and I'll give you around three minutes to kind of get into the case and then at around the three minute mark or so, I will either ask a question or if I'm not ready to ask a question, I'll go in seniority so I then ask Judge Ballwack if he has a question and then I would ask Judge Carson and for the most part, we will do kind of a rotation by seniority. If there's some dead air, I'll invite the arguing counsel to recommence with your argument points. So it will go fine. We only have two arguments this morning so I'll be generous with the time and certainly because of the suboptimal conditions will allow for rebuttal time to a limited extent as well. So if all of that is clear, please let me know if you have a question right now. Otherwise, I think we can begin with the counsel for the appellant and that would be Mr. Fuchs. Your Honor, I do have one question. Yes. At the three minute mark, should I stop or will you stop me if there is a question? I will interrupt you when it's ready for questioning. Thank you, Your Honor. You may proceed. Thank you, Your Honor. Devin Fuchs on behalf of the District Court. In the present manner, this court must overturn the District Court's ruling because the government has not met its burden of proving an exception to the warrant requirement applies in this manner. The government bears an especially high burden of proving that an exception to the warrant requirement applies and we know this from this court's ruling in the United States v. Martinez back in 2011. First, the government can offer no facts to support an objectively reasonable basis to believe that aliens were in the home of Mr. Moore or that if there were aliens in that home that one of them was injured or in need of an immediate emergency aid. Second, Your Honor, the government's effort to save the conviction and the tainted evidence by raising the inevitable discovery and plain view, both those efforts fail because in the defense position, those issues weren't preserved below, but even if we assume that they were preserved, this court still must overturn the District Court's ruling because the government cannot pass the test set forth in United States v. Sousa. Specifically, with regard to the Sousa test, it was highly unlikely that a warrant would have issued in this matter because there is no probable cause to issue the warrant when the tainted information from the illegal sweep is excised. Beginning first, Your Honor, with the matter as to whether or not exigent circumstances existed, the government must prove credible and specific information or must provide credible and specific information that someone is at a particular location, in this case Mr. Moore's home, and that that person is in need of immediate aid and that also is from the United States v. Martinez. In doing so, the officer must be able to point, and this is really the crux of the exigent circumstances argument, the officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant the intrusion. And this is particularly important in this case because we are talking about somebody's home, arguably the most protected area in Fourth Amendment jurisprudence. And in this case, the government can provide no facts which would lead an officer to believe that someone might be at Mr. Moore's home and, more importantly, that that person is injured. Generalities are not enough. The government, in its response, and during the oral argument in the district court, stated that the officers had information on several different subjects that gave them pause. One, that cartels might be involved, and based on the way that cartels treat individuals such as these who are seeking entry in the United States, one of them might be injured in transport because those people are viewed by the cartels as cargo. The government also indicated that something seemed suspicious and that they were concerned for someone's well-being because it seemed unusual that the drop occurred as it did. Be that as it may, those types of generalities are of no use to this court, first because the government never provided any evidence that would connect the cartels to this case. Without that nexus, they're simply guessing or hypothesizing as to what may have possibly been going on with this drop-off. All right. Thank you for that opening statement. I'm going to pass to Judge Baldock and let him go first if he wants. I have no questions, Chief, at this time. All right. Judge Carson? I don't have anything yet. All right. Well, then I will go. I was just trying to be polite. I'd like to kind of go backwards from the search warrant, and can you explain for me why they didn't have probable cause for a search of the home if we excise the statement about the gun safe and the ammunition? Why wasn't there sufficient reason to believe that there might be evidence of criminal activity contained in the home on a cell phone, on an iPad, on a computer? It looks like Mr. Moore ran his trucking business from his home, as far as I can tell. His home base for the company was in Iowa. Why wouldn't one think that there might be some likelihood that he stores evidence related to his alien smuggling operation in the home? Thank you. Thank you, Your Honor. Your Honor, there simply isn't a connection between the criminal activity and the home. The government did not prove that below, and they cannot do so now by pointing to anything in the record. While Mr. Moore may have used his home as an address, I would suggest that he doesn't have any other option. When you're a truck driver and you're mobile all the time, then obviously your home is going to be the place where people need to reach you with relation to your work. But in terms of the criminal activity, there is nothing that connects the actual act of bringing the alien to his home. Hold it. Don't you think it's likely that the authorities might find a cell phone or a computer that's used for these activities inside the home? I think it's probably very likely, but that's not really the issue, as I see it, Your Honor. The issue, as I see it, is if they can connect the illegal activity to those objects. As Your Honor knows, when you're looking at a particular object in a search warrant, there has to be a connection between that object and the criminal activity. And in this case... What about the affidavit says they're looking for electronic devices that could be used to store evidence, text, emails, evidence of banking activity, or electronic communication devices that would be used to conduct and arrange business? Why doesn't that create a nexus to looking for electronic devices within the home? Is this still Judge Tinkovich? I'm sorry. Yeah, I'm sorry. It was Judge Tinkovich. Okay. Well, to answer your question, Your Honor, when we talk about items that are extremely common that literally everybody has, by simply, or virtually everybody has, by simply saying that we may find these in the home, it doesn't really do much for the court. If I had to hazard a guess, I would say that every person on this call has a cell phone. Most of us have computers or laptops or tablets, which we also use at home. A lot of us do our banking electronically and use our laptops and handheld devices for those activities as well. So just by simply stating that those objects may exist, that applies to just about everybody. In order for the affidavit to supply a probable cause, there has to be a nexus between the criminal activity and the object itself. Not just that they might have that object. That is true. They might, and most of us do. But without some connection between the two, the warrant falls, the affidavit falls short. You know, the government... This is Judge Tinkovich again. I think that's a good rebuttal. We have a case called Sanchez that, you know, kind of similar type of argument. And the court held that case involved drug distribution. And the court concluded that it was more likely than not that drug dealers would keep evidence of their activities in a home. How would you distinguish this case from Sanchez? Well, I thought in Sanchez, Your Honor, if I remember correctly, and I'm not sure I do, but I know that there have been other cases as well that have talked about the difference between the uniqueness of drug cases themselves. And if Sanchez was a drug case, and perhaps I would suggest that that case is different because of the nature of drug dealing. People often operate out of their homes. They frequently don't have an office, depending on how high up in the drug trafficking scale you are. So it would be more likely in a drug trafficking case that something might be found at somebody's home. However, in this case, Mr. Moore's primary place of business is in the cab of his truck. That's where his business occurs. The police didn't know that, did they? I believe the police didn't know that because as I read the discovery, and more importantly, the record before the court, my understanding was that that's how they found out where Mr. Moore lived. They actually contacted the company that he worked for, and they provided him with a home address. So I would suggest that the evidence tends to show that he did actually know that. I just want to go over to Judge Sienkiewicz one last significant question. But does the record disclose whether they found anything related to alien smuggling in the home, that all they found were the guns and ammunition? They did not find anything related to the smuggling in the home, based on the record. All right. Well, if my judicial colleagues have any follow-up questions, feel free to jump in. This is Judge Baldock, and I'm wondering how the defense counsel would explain how U.S. v. Bigelow fits into this scheme. I'm not familiar with Bigelow offhand, Your Honor. If you could just provide perhaps just a brief explanation or a last person you want to ask about what the case stands for is the case that was authored by that judge. And I happen to author Bigelow. So if you're not familiar with it, we'll go from there. Thank you. I apologize, Your Honor. Judge, can I pop in with a question? This is Judge Carson. Yes. Counsel, aside from the boilerplate in the affidavit, were there any statements in the allegation or in the affidavit outlining why the officers thought that Mr. Mora might have any of this information at home? No, Your Honor. Beyond the typical kind of based on information and belief or training experience, drug trafficker or the people who smuggle used phones, beyond that type of language, there's nothing specific that would connect those objects to Mr. Mora's home. More importantly, when we look at the cases that the government cited, the Williams case and I believe the Reyes case as well, Your Honors, those cases don't really help the government. In Reyes, the law enforcement had actual proof that the drug activity that was going on at the location, that the people who were involved in that activity actually kept records at their home. So they had that nexus. In the other cases the government cited, there were witnesses, co-defendants, and telephone records which connected that individual's home with the illegal activity. The government doesn't have that in this case. We think that a case that is more directly on point for what it's worth, it's not from our circuit, it's from the D.C. circuit, but that would be the Griffith case where the court found that the language that was used in that affidavit regarding cell phones, very similar to the language that's in our affidavit, did not suffice and would not carry the data to save the warrant because the affidavit showed no connection between the individual and the cell phone that they sought. There was no indication that any phone calls had been made in between any of the individuals involved in the crime on a cell phone. There have been no text messages and indeed no one had actually even seen the defendant in that case with a cell phone at all. And that's very similar to the case that we have here. Wait, counsel, this is Judge Baldock again. Why doesn't the Agent Lopez's affidavit describing the types of items that an alien smuggler typically utilizes give rise to reasonable inference in the evidence seized from the defendant's residence in this case? I'm sorry, that last thing you're on, I didn't hear you. Looking at that affidavit of Agent Lopez, why doesn't that description at least give reasonable inference that the evidence seized would be found there? Because everybody has those items and there's no connection between the criminal activity and the items as well. So as I stated before, everyone has those items. We can't simply open the door to search the most guarded location in Fourth Amendment jurisprudence because someone has a cell phone. That's not enough. There has to be a connection between the cell phone and the criminal activity. Some may be getting phone records that indicate that Mr. Moore was taking or receiving phone calls related to the criminal activity on a cell phone. That happens frequently. It happens all the time in our cases. In this situation, the government and the affidavit just have no connection beyond this kind of general information. Your Honor, I think... I'll give you some rebuttal time. Go ahead. Go and finish your final statement there and I'll give you some rebuttal time. Thank you, Your Honor. I would just say that the inevitable discovery in plain view do not carry the day for the government in this matter. There's just simply no connection in the affidavit with the excised information that would actually connect any of those objects as very general common objects to Mr. Moore and to the crime that he's accused of. And as far as exigent circumstances go, Your Honor, the government cannot provide any specific articulable facts that would indicate that anyone was injured or that anyone was in the home. All right. Thank you, Counsel. Let's hear from the United States now. I think Ms. Walters, you're taking the lead. Yes, Your Honor. Good morning. May it please the Court, Tiffany Walters for the United States. Moore contends that as a result of the agent's three-minute humanitarian sweep of his home, all evidence found in his home must be suppressed, including the firearms and ammunition seized during the later execution of a search warrant. The agent's initial sweep was lawful because agents had an objectively reasonable basis to believe that migrants in need of emergency aid may have been in the home. But even setting aside the only two pieces of information gleaned during the sweep, the gun safe and ammunition cases that were spotted by agents, there was overwhelming evidence to establish probable cause for a search warrant of Moore's home to search for evidence of alien smuggling. Because the search warrant would have issued even without the information from the sweep and the firearms and ammunition would have inevitably been found, the Court should affirm the District Court's denial of Mr. Moore's suppression motion. Even disregarding the information obtained during the sweep, there was ample evidence in the affidavit to establish probable cause. There is ample evidence to establish probable cause to believe Moore was engaged in alien smuggling and he's not presented any argument to the contrary. On top of that, there's also ample evidence to establish a connection to the home. For purposes of the affidavit, the government... This is Judge Sienkiewicz. Why don't you focus on the specific factual nexus between the alien smuggling and the home? The counsel for Mr. Moore makes a good point that the items that identified are in every home right now. What makes this crime particularly special and that would take it out of the mind run of just about every other type of crime? Certainly cell phones and records can be used for innocent purposes. We all use these items every day, but here the situation is different because here we have an experienced ICE agent stating that based on his knowledge and experience, alien smugglers specifically use these types of items for purposes of alien smuggling to arrange and conduct business, as well as to keep records, to use the banking system for transfers, and to use electronic devices to store communications, photographs, videos, all of those types of items. The importance of these records is clear from the fact of this case. It's perhaps even more evident in alien smuggling cases than in drug trafficking cases. Here you have a smuggling trip involving 30 to 60 individuals. They're picked up from a stash house in El Paso and then transported to Albuquerque. You have individuals that have to coordinate getting payment from these individuals, getting specific locations. It's a much more complicated enterprise than just exchanging money for drugs in a drug trafficking case. It's essential and reasonable to believe that drug alien smugglers will keep some sort of records or have some sort of communications that allow them to set up this transaction and to effectuate it and to keep track of who's paid and who hasn't paid. The inherent nature of the alien smuggling enterprise itself supports the reasonable belief that there would be evidence of alien smuggling in things like electronic devices and ledgers and that they would be in his home in the context of drug smuggling cases. This court has repeatedly found that it's reasonable to believe that this sort of evidence is stored in the home. Mr. Mora focuses on some of the cases in which there's factual means of distinguishing factually, but in this case, in many of these cases, the court is finding repeatedly that it's reasonable to assume that certain types of evidence would be kept at a defendant's residence. And the types of evidence identified in the affidavit here are types of evidence that would reasonably be kept in the home. On top of that, we have the fact that Mr. Mora, after completing the alien smuggling trip, goes to Walmart and picks up some beer and tortillas and then comes directly home. So Mr. Mora's alleging that the truck itself was the only basis for his business, but it's reasonable for agents to believe that given that there is no third location, there is no office, there is no alternative location where any records would be kept, that there would be records or communications or other information related to the alien smuggling enterprise that would be stored in his home. Chief, can I jump in here with a question? Yes, Judge Carson. So you just said he went directly, that Mr. Mora went directly home, but that's not actually what happened after, is that he was picked up. Didn't the officers actually beat him home and they had to do some investigation before they could get there? They did. What we do know, what is in the record is a surveillance video that documents Mr. Mora leaving the truck in the Walmart, going inside the Walmart. There's various surveillance videos from inside the Walmart where he's conducting shopping, and then I believe he's captured on a surveillance video getting into the Gold Cadillac, which is what picked him up, and then that's the vehicle he arrives in at his home. Okay, but the, I mean, he didn't go straight home from getting his beer and tortillas, did he? We don't have, you can't establish that timeline. Correct. Okay. So I have another question for you, just about the search warrant. So say I'm the agent and I execute an affidavit for a search warrant and it says that I received a report that the truck let out some human cargo behind an Albertson store, and I responded to that, and I later discovered, you know, sometime later that the truck was parked in a Walmart parking lot, and I examined the truck and it was empty and there was a bottle of urine in it, in an odor, but other than that, that there was no evidence of any humans being in the truck. And then the rest of my affidavit is based on my own experience and not the specific circumstances of this case, and I say I've, you know, investigated many human trafficking cases, and in my experience, you know, human traffickers use cell phones and they also use computers, and they sometimes or often keep records, and in my experience, they'll keep these records in their home, but I make no specific allegations about this defendant keeping these kind of records. Are those boilerplate allegations sufficient to get you in the home? I think in this case, they are, because we have the boilerplate allegations combined with the nature of this alien smuggling enterprise, the scope of 30 to 60 individuals. So, I mean, you don't know anything about that. You have someone who was basically speculating as to the number of people. I think the source even admitted they were speculating. They were throwing a number out. Isn't that right? Yes, they were absolutely estimating. I mean, 30 to 60 is a large range, but we know that this isn't, you know, this isn't two people in the back of a truck where perhaps you could, you know, coordinate and arrange for payment and all of that without any record trail. You have someone who's estimating, an eyewitness who's 30 to 60 individuals approximately exiting the back of a truck. And so that, I think, combined with the agent's experience that alien smugglers do generally keep records, and here you have an operation of that scope, it's reasonable to believe that there would be some sort of records or some sort of communication to enable that sort of operation to occur. So, remind me of this. In the affidavit, is there any affirmative statement that in the officer's experience that the person doing the actual transport collects money or verifies drop-off of the cargo? No, there's nothing specific to the person doing the transport versus alien smugglers in general. Okay. I have one more question, and that is how the police beat the defendant home? Do you know how long they waited outside before they went to the door and called for the son? I believe at least some of the agents got to the home around 1032, and Maura pulled up there at 1036, and I believe that shortly after they stopped Maura and confirmed with the wife that the son was in the home, they called out for the son. They were interviewing Mr. Maura by 1045, and then the sweep occurs at 1054. So, I suppose sometime between that 1036 and 1054 is when the son was called out. Okay. Is your theory on the protective sweep that some of the aliens that had been smuggled into Albuquerque by Mr. Maura for this incident had somehow hid in his personal residence, or that because he's an alien smuggler that there might be aliens in the house from other previous operations? I believe the agents were concerned about aliens that might be in the house from this particular operation, and that was largely because of the unusual nature of the drop-off behind the Albertsons. Typically, alien smugglers don't receive payment until the smuggled migrants actually reach their destination, and so it was just highly unusual. Agents said they had never seen this before, where a smuggler drops off individuals short of their final destination. Most of the aliens weren't going to places other than Albuquerque. They didn't even know they were being dropped off in Albuquerque or New Mexico. They didn't have any means to reach their final destination. So, it was extremely odd, given that that might actually impact the smuggler's ability to financially benefit from this operation if these individuals were subsequently picked up or weren't able to reach their final destination. How much time passed about that? Go ahead, Judge I don't buy the exigent circumstances basis of what the district court did. In looking at the affidavit of Agent Lopez, what would you rely on in that affidavit that would say that there was still probable cause to get the warrant to go into that? Other than just the general information that we've already heard about that, well, there's cell phones and there's things everybody has. So, if I'm not buying the argument of the exigent circumstances, how do you survive with just the affidavit? Go ahead and finish your answer. Sure. So, the affidavit first establishes probable cause to believe that Mr. Moore is engaged in alien smuggling. Unless there's specific questions to that, I won't detail that because I don't feel that Mr. Moore is particularly challenging that. And then, on top of that, you have the training and experience of the agents that have found that alien smugglers do keep records and the case law of this court showing that it's reasonable to believe that those sort of records, cell phones, electronic devices, are kept in the home. This is even more compelling than a drug trafficking case where this court has regularly found that these are the type of things that I believe that, based on the affidavit, there is sufficient evidence to establish probable cause to believe not only that Mr. Moore was engaged in alien smuggling, but that there was a likelihood that he would be storing this type of evidence in his home. Thank you. Ms. Walters, I'm sorry. You still have two minutes. Sorry, that was one about too many. I'm sorry. Thank you. I forgot to start my own timer, so I appreciate that. Just to get back on track, are there any other questions from the panel? I have another one. So, I guess, mine is on the exigent circumstances. And my question on that is, if the idea is that the officers were worried that there were people in danger in the home and that they went to the home and went into the home because they were concerned about safety of the people inside, why did they wait for Mr. Moore to come home? Why didn't they go directly to the door and knock? I think some of that might be answered in terms of the timeline. If they're arriving at the home at 1032 and Mr. Moore is arriving at 1036, we're talking about events that are occurring in rapid succession. I do believe that the agents were also giving it some hard thought in terms of whether or not they should go into the home and whether or not that was appropriate under these circumstances. They reached out to the U.S. Attorney's Office to confer with him and get legal advice on whether or not they should enter the home. But ultimately, they testified that they had concerns regarding the safety of individuals that may be in the home and that those trumped their concerns about the impact that that might have on the case subsequently. So the agents did act relatively quickly, but at the same time, they didn't do so recklessly. They gave some thought to whether or not this was appropriate and decided that the risk was such that they wanted to confirm that there was no one in there who needed emergency aid. Right. But at the time they were waiting outside the home, the record is going to show us, isn't it, that there was no sign of any problems within the home? There was no external indication that somebody might be in danger? Yes, there's no indication from the home that someone was in danger. The concern about the danger largely stems from the unusual circumstances regarding the drop at the Albertsons. Okay. I think your time has expired. Thank you, counsel. We appreciate the argument. If we can give Mr. Fuchs two minutes for rebuttal, he may proceed if he wishes. Thank you. Thank you, Your Honor. Regarding actions and circumstances, Your Honor, Judge Carson, Your Honor makes a very good point, and I'd like to take it just one step further. The officers arrive at the house. They have some time there. They do not speak to any of the neighbors to see if they had seen anybody milling about. They did not conduct any investigation on the fact that someone entered inside the house. They did not knock on the door. They didn't look in any windows, although that might have been a problem as well from a defense perspective. But in any event, they did no additional research to determine if someone was inside the house or entered inside the house. And to take it a step further, as I said, when Mr. Mora does get home, they arrest Mr. Mora, ask him a few questions, and then they proceed to ask his wife a number of questions. And one of those questions is whether or not they can search the house. She says, no. No, you cannot search the house. And it's only after that moment that she says, no, you can't enter my house, that the notion of actions and circumstances comes up. And so I would ask the court what happened in between the time that the officers arose at the location at Mr. Mora's house, did not search his house, did not speak to anyone, did not conduct any other investigation on whether or not someone was injured, and then go on to speak with Ms. Mora without mentioning whether anyone else was in the house other than her son, or excuse me, they asked if anyone else was in the house. She said, no. Only after that conversation does actions and circumstances become important. And it's at that point that my understanding from the discovery and from the record is that when they went and spoke to the USA about whether there might be actions and circumstances to go into the home, um, it's very suspicious, at least from the defense perspective. You know, we keep talking about, um, I heard some of the judges and opposing counsel refer to the scope of this operation. And it strikes me that we really have no evidence in the record at all as to what the scope of the operation was. We'd say, well, generally, or excuse me, I've heard counsel with the scope. Go ahead and finish your statement. Thank you. I was simply going to say the, the, the, the government has said, well, what was the scope of an operation like this? You would expect that records would be held at home on the cell phone and other places, but where's the, there is no evidence actually talking about what the scope of this operation is. So that is speculation. Um, my time is up your honors. I thank you for your time and your questions. Thank you, counsel. I appreciate both of your dropped off the, off the call. I suspect. And, uh, for judge Carson, um, we would try to conference on this case at 10 30 on the, on the other call in line, if that's acceptable to you. That sounds good. Thank you.